JOE A. COWART, Jr., Associate Judge.
This case involves a cooperative apartment and the right of a member to sublease an apartment unit.
A developer-promoter constructed 88 apartments in Dania, Florida, and formed the appellant as a non-profit corporation to *812 own the fee title and to operate and manage the apartment complex for the benefit of its members. There is no corporate stock and the interest of each member in the appellant-corporation is represented by a Certificate of Membership and a Proprietary Lease, on standard forms, issued for each apartment unit. These instruments, in a sense, become appurtenant to a particular apartment subject to the corporate charter and by-laws. The charter provides that the total capital valuation of the corporation is equal to the original sales price of all 88 apartment units and that the first Board of Directors will fix that valuation before December 31, 1958, and will allocate it to each individual Certificate of Membership and Proprietary Lease as its assigned capital value. This capital valuation, once assigned, is not to change. A party desiring to “buy” an apartment pays, or agrees to pay, a price equal to the money value of a particular apartment unit, not for the physical apartment itself, but for a membership interest in the cooperative corporation of a value equal to that of the apartment unit to which it is appurtenant. The corporation then executes a Proprietary Lease to the particular apartment unit “purchased”. No rent is paid, but members pay a quarterly “maintenance” for shared operating expenses of the cooperative. The member-lessees elect the Board of Directors, who manage the cooperative. The charter authorizes the original Board of Directors to adopt the original by-laws and thereafter the authority to make, alter or amend the by-laws is vested in the membership of the cooperative.
Paragraph 19 of the standard form of Proprietary Lease prohibits assignment or subletting except in accordance with the by-laws. Paragraph 54 of the original bylaws provides that the Board of Directors can control subleasing and requires their approval of subleases on forms and conditions to be uniform as to rental and for a term not to exceed one year without renewal options. This by-law further provides that: "Any sub-lease of an apartment held in the name of [the original developer-promoter] shall be exempt from the provisions of this paragraph.”
Under this arrangement, the developer, who originally owns all, at some point loses control of the corporation to the members. The position of the developer is not unlike that of the lady who rode the tiger. Here, as is usual, when about half of the units had been “sold”, the members asserted their right to management, and the resulting dispute was settled on February 5, 1960, by the members taking over the corporation and the premises and the developer thereafter became an ordinary apartment unit owner, paying maintenance charges and having no special rights except the reserved right to sublease or sell the remaining unsold units without the Board of Directors’ approval of purchasers.
The appellees, on November 27, 1961 purchased from the developer a membership interest and received a Proprietary Lease to one of the last retained units. The developer represented to the appellees in a sales brochure that they could sublet the unit “for any period of time that you should so desire”. Thus the seeds of controversy were sown when the appellees became members of the appellant non-profit cooperative apartment corporation.
Another latent problem arose: Notwithstanding the clear direction in the charter, the first Board of Directors failed to fix the original capital valuation of the corporation on or before December 31, 1958, and failed to allocate that valuation to each individual Certificate of Membership and Proprietary Lease and over the years confusion resulted. Corporate officers erroneously inserted the actual resale price when membership units were subsequently resold and replacement certificates and leases were issued. In addition, many Certificates of Membership, including that of the appellees, were issued with the capital valuation left blank.
To belatedly establish the proper original capital valuation of corporation assets and *813 allocate that value among the membership certificates, the Board of Directors caused the financial history of the corporation to be reviewed and by resolution dated March 26, 1971, the Board of Directors reestablished and adopted and assigned capital valuations to the current Certificates of Membership appurtenant to all 88 apartment units. All members surrendered their certificates for cancellation and re-issue with the re-established valuations except only the appellees.
On May 6, 1971, the membership, by 70% favorable vote, amended Paragraph 54 of the original by-laws to prohibit all subleasing except that the Board of Directors could authorize subleasing in hardship cases for up to four months out of any twelve month period.
The appellees filed this suit to have the amendment of By-Law 54 declared void and the recall and reissue of Certificates of Membership with capital valuation thereon declared invalid and for the court to declare that appellees’ original Certificate of Membership was in effect and that the appellant be enjoined from interfering with appellees rental of their apartment. The trial court found for the appellees and, in effect, granted the requested relief. This appeal resulted.
The corporation by-laws, Section 59, provides as follows:
“AMENDMENTS OF BY-LAWS
59. These By-Laws may only be altered, amended or added to at any duly called meeting of the members, provided (1) that the notice of meeting shall contain a full statement of the proposed amendment, (2) that the quorum requirements for such purpose shall be a majority of all outstanding votes, and (3) that no amendment, alteration or addition to these By-Laws shall be valid if its operation would be inconsistent with or adversely affect equity rights contained in the Certificate of Incorporation or the Membership Certificate.”
The trial judge based his decision on his finding that any by-law amendment more restrictive on subleasing than original ByLaw 54 would be inconsistent with and adversely affect the equity rights of a member because “a lease without restriction on sub-letting is economically more desirable than one where the right to sub-let is severely limited. Accordingly, any attempt to amend the By-Laws with respect to sub-letting requires the unanimous consent of the entire membership”. Likewise, the trial judge held that since the 1971 establishment of capital valuation was not in accordance with the charter, which required this to be done before the end of 1958, the reestablishment of valuation amended the charter and adversely affected equity rights in violation of By-Law 59 and held that any later capital valuation would require unanimous assent of the entire membership.
The word “equity” has many meanings. First, it refers to a body of law, sometimes called chancery, established in early English days and recognizing certain rights not cognizable by the common law courts. When the legal title to property was held by one person for the use and benefit of another, called a trust, the beneficial owner was required to resort to equity for recognition and enforcement of his rights. Therefore, such rights were sometimes called equitable or equity rights. To secure a loan at common law, the borrower transferred the legal title to property to the lender and if the loan was repaid but the lender refused to reconvey the title, the borrower was required to resort to equity for recognition of his right to have a re-conveyance. After passing the legal title as collateral, the borrower was deemed to have only an “equity of redemption” in the property and in the commercial world the value of property, less the amount owed against it, came to be called the owner’s “equity” in the property.
We believe the trial judge erroneously construed the words “equity rights” in By-Law 59 to relate to the eco *814 nomic or monetary value of a member’s rights when those words were meant to refer to the member’s right to govern the affairs of the cooperative by direct vote and election of the Board of Directors and to the member’s rights in and to the property the legal title to which is held by the appellant corporation. The limitation in By-Law 59 on amendments to the by-laws prohibit amendments inconsistent with or adversely affecting “equity rights contained in the Certificate of Incorporation or the Membership Certificate.” Nothing in either of these documents authorize subleasing by members, therefore, subleasing is not an “equity right” within the limitation on by-law amendments contained in By-Law 59. The Certificate of Ownership itself specifically provides that the member’s rights in and to their apartment are subject to the by-laws “and any and all Amendments thereto”. The Proprietary Lease likewise provides that the leased apartment must be used according to the by-laws. A by-law may be merely declarative or repetitive of some charter provision but otherwise one by-law cannot limit the power to amend another by-law since the limiting by-law is itself subject to amendment or repeal. See 18 C.J.S. p. 600, Corporations, Section 188a, and 8 Fletcher, Cyc. of Corporation, 648-651, Section 4176.
By-Law 11 provides that at a membership meeting with a quorum present “the vote of a majority of the votes present— shall decide any question brought before such meeting” in the absence of contrary express provisions in the charter or bylaws. Therefore, we conclude By-Law 54 was subject to amendment by a majority of the membership.
The trial court relied on Tompkins v. Male, 1939, 172 Misc. 1071, 15 N.Y.S. 2d 854, Aff’d., 259 App.Div. 860, 20 N.Y.S. 2d 398, affirmed at 284 N.Y. 675, 30 N.E.2d 721, which held that wnere the original plan of organization of a cooperative apartment, the subscription agreement and the proprietary leases, contained no provision for modifying the terms of the proprietary leas", a resolution authorizing a modification procedure required the unanimous approval of all members. We do not find this case relevant here. In Tompkins there was no provision for amending the proprietary leases and no provision for adopting a method for making such amendments and the court enforced the member’s resulting right to have no method for amending the basic organizational documents. However, as noted above, the appellant’s charter specifically authorized the members to amend the by-laws, the Proprietary Leases prohibit subletting except in accordance with the by-laws, and the bylaws themselves provide for regulation of subleasing and for amending the by-laws by a majority vote of the membership.
It should be noted that a cooperative residential housing project, such as is involved in this case, is an unusual undertaking where the cooperative entity, in corporate or other form, owns all the property and units and the individual member’s rights to occupy the units and other “equity rights” are only those given in the charter or other organic document of the entity and in membership certificates, by-laws and leases. This must be sharply distinguished from customary subdivisions, where persons own the title to their houses subject only to land restrictions and zoning, building and other governmental regulations, and from condominiums where the living units are privately owned by persons who also have certain rights and an undivided share in common elements which are appurtenant to the living units. See Chapter 711, Florida Statutes. Cooperatives are more communal than the more common living arrangements and members have fewer individual rights than persons owning legal title to property. Cooperative members generally hold their occupancy rights in common with that of other members subject to the views of a majority of the members. For this reason, cooperative living would be undesirable to many, yet it is a lawful arrangement and the court *815 should not add to, or subtract from, the rights of the individual members or of the majority.
Notwithstanding the developer’s sales brochure assurance to the appellees that they could sublet at their pleasure, the appellees in their purchase agreement acknowledged they had seen and approved the charter, by-laws, Proprietary Lease and Membership Certificate. Of course, once the apartment unit was transferred to the appellees or others it was no longer “held in the name of” the developer-promoter and no longer subject to the exception to Paragraph 54 of the original by-laws which generally required approval of subleases by the Board of Directors and limited such subleases to one year without renewal. The brochure representation was also inconsistent with Paragraphs 19 and 27 of the appellees’ Proprietary Lease, which like all other such leases, provided that the lessees could not assign or sublet except in accordance with the by-laws and that all provisions of the lease were subject to be changed by a majority vote of the by-laws, provided such amendment applied uniformily to all Proprietary leases. Also, of course, the developer, in 1961, was but an ordinary unit owner with only the special personal right to lease or sale without approval of the governing body of the appellant-corporation and the developer had no right to represent, commit or bind the appellant or the membership of the appellant.
The charter provision directed the original Board of Directors to fix and assign capital values to each Certificate of Membership so that if the corporate property is sold or the corporation dissolved, each member would receive a share of the distributable assets in the proportion the valuation of that member’s certificate bears to the total assigned capital value of the corporation as provided in the by-laws. The original Board of Directors having failed to perform their duty to assign value to all Certificates of Membership, any subsequent Board of Directors, with the approval of a majority of the members, not only had the right, but the duty, to complete the corporate organizational effort and to establish and secure each member’s right to participate in any distribution of corporate assets, by assigning capital value as provided in the charter. Neither the method of establishing valuation nor the accuracy of the determination made are questioned in this case. Under the circumstances the recall of the old, and the issuance of new Certificates of Ownership (Membership) with capital valuations established as provided in the charter were legal and valid acts.
The final judgment below is reversed and this cause is remanded with directions to enter judgment consistent herewith and for consideration of injunctive relief as demanded in Count 1 of appellant’s counterclaim.
Reversed.
CROSS and MAGER, JJ., concur.